IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:21-cv-

STEVEN R. SCHWAB

      Plaintiff,

vs.

MCKINNEY DOOR AND HARDWARE, INC., a Colorado corporation, and
KRISTOFER E. KALTENBACHER, an individual, and
NICOLE C. BABER, an individual,

      Defendants.
_____

# COMPLAINT
_____

Plaintiff, Steven R. Schwab ("Schwab"), by and through his undersigned attorney, brings this Complaint against Defendants, McKinney Door and Hardware, Inc. ("McKinney"), Kristofer E. Kaltenbacher ("Kaltenbacher"), and Nicole C. Baber ("Baber"), and states as follows:

## NATURE OF ACTION

1. Schwab brings this action under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2615(a) and alleges interference with his rights thereunder by his former employer and its officials.

2. Schwab has also contemporaneously filed an administrative Charge of Discrimination with the U.S. Equal Employment Opportunity Commission (EEOC), in which he has alleged that McKinney discriminated and retaliated against him based on his disability. Schwab will seek leave to amend his complaint to add that claim upon the

-1-

completion of the administrative process required for the charge, and his receipt of a Notice of Right to Sue from EEOC.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, in that Plaintiff's claims arise under the FMLA, 29 U.S.C. § 2601, *et seq.*

4. Venue is proper in the District of Colorado under 28 U.S.C. § 1391(b) because the events giving rise to these claims occurred in this District and because McKinney does business and is located in this District.

5. This Court has personal jurisdiction over McKinney because it does business and is found in the District of Colorado, and because the claims set forth herein arise, in whole, from events that occurred in the District of Colorado.

6. This Court has personal jurisdiction over Kaltenbacher because he resides in Colorado.

7. This Court has personal jurisdiction over Baber because she resides in Colorado.

## PARTIES

8. Schwab is an adult citizen of the State of Colorado and resides in Colorado Springs.

9. From December 17, 2020 onward, Schwab was an "eligible employee," within the meaning of 29 U.S.C. § 2611(2), because by that date he had been employed by McKinney for at least twelve (12) months and had worked at least 1,250 hours for McKinney during the twelve (12) month period preceding the events described herein.

10. McKinney is a Colorado corporation doing business at its locations in Pueblo and Colorado Springs.

11. At all relevant times, McKinney was Schwab's employer within the meaning of 29 U.S.C. § 2611(4).

12. At all relevant times, Kaltenbacher was McKinney's President.

13. At all relevant times, Baber was McKinney's Human Resources Manager.

## **FACTS**

14. McKinney operates its business out of two locations, one in Pueblo, and one in Colorado Springs. Those locations are within 75 miles of each other.

15. Schwab worked for McKinney from December 17, 2019, to January 29, 2021.

16. Schwab worked full-time as a Project Manager for McKinney.

17. McKinney started paying Schwab at an annual salary rate of $65,000 per year. On February 23, 2020, it raised his salary to $67,500 per year.

18. As part of his job duties, Schwab worked in McKinney's office in Colorado Springs. There, he had a desk, a phone, and a computer. He had a work email account that he could also access remotely from home. He also had a work cell phone.

19. At all relevant times, McKinney also knew Schwab's personal email address and his personal cell phone number. On one or more occasions, McKinney used that information to contact him outside of regular work hours.

20. Beginning in approximately May 2020, Schwab was supervised by Ethan Bronner ("Bronner"), Sales Manager for McKinney's Colorado Springs office.

21. On or about September 25, 2020, Schwab experienced sudden severe pain and limited ability to use his right shoulder and arm. He promptly sought medical care.

22. Following a video tele-medicine appointment and evaluation, Schwab's regular doctor opined that he probably had a torn rotator cuff and would likely need surgery to correct it in the near future. She prescribed Schwab some hydrocodone for pain, and referred him to an orthopedic surgeon for further evaluation and care.

23. On or about September 28, 2020, Schwab notified Kaltenbacher, Bronner, and Baber about his shoulder problem. He included the fact that he had been prescribed narcotic medication, because he understood that it would show up on the results if the company directed him to take a random drug test, and also because the medication potentially affected his ability to drive safely. Schwab also told them that he would likely need to undergo surgery on his shoulder.

24. Kaltenbacher and Bronner responded to the information Schwab provided them by telling Schwab that they each knew other persons who had experienced what they believed were shoulder injuries/conditions, and that those persons had had surgery followed by physical therapy.

25. Schwab told Baber that he would need some form of leave if he was going to undergo surgery. Schwab expressed to Baber that he was concerned about any potential loss or reduction in his income that might result from any period of leave.

26. Baber responded that Schwab could use accrued paid time off ("PTO"), and also that he might file a claim for short-term disability ("STD") compensation – an employee benefit that McKinney provided to him as part of his employment.

27.     Baber also told Schwab that if he did not have enough accrued PTO to cover his anticipated absence following surgery, and to avoid any potential loss or reduction in income, that the company would allow him to "go negative", i.e. take more PTO than he had accrued by that date, which would then be covered by further accrual of new PTO as he continued his employment.

28.     At that time, Schwab did not know specifically whether, or when, he would actually undergo shoulder surgery, or how long his period of required leave might be. However, there was no question in his mind that he would need at least one week, and probably two weeks of leave, which he discussed with Baber.

29.     Also at approximately the same time, Schwab purchased and began wearing a sling on his shoulder/arm all day. This obviously attracted attention from other employees with whom he worked at McKinney. Kaltenbacher and Bronner noticed and discussed it with him specifically and directly.

30.     From the onset of his shoulder condition in late September 2020, Schwab experienced substantial difficulty caring for himself, as he was now unable to effectively use his right arm at all. He required assistance getting dressed and undressed, and in performing any manual tasks.

31.     On October 14, 2020, Schwab had x-rays taken of his shoulder, and on October 15, 2020, he was evaluated by orthopedic surgeon, Dr. Matthew W. Kluk ("Dr. Kluk").

32.     Dr. Kluk told Schwab that based on his evaluation, including the x-rays, that it was extremely likely that he would recommend surgery on Schwab's shoulder.

However, first he ordered a magnetic resonance imaging (MRI) test for Schwab, and also directed Schwab to begin physical therapy.

33.     Dr. Kluk also changed Schwab's pain medication from the hydrocodone he had been originally prescribed by his regular doctor, and replaced that with a prescription for Tramadol – another opioid medication classified by the U.S. Drug Enforcement Administration as a schedule IV narcotic under the Controlled Substances Act.

34.     Schwab immediately notified Kaltenbacher, Baber, and Bronner regarding his new medication, and reiterated the concerns he had previously expressed to each of them about his ability to drive safely.

35.     Schwab had tried not to take the hydrocodone during work hours, because of his concerns about the effects of the drug. However, to manage the ongoing pain in his shoulder, he now had to take Tramadol during the day, and was under the influence of that medication during the workday.

36.     While under the influence of Tramadol, Schwab experienced a significant diminution in his mental acuity. He had difficulty concentrating, thinking, reading, and communicating. He had some temporary lapses in memory, such as not being able to remember the details of his travel to work each day. Schwab discussed these concerns with Kaltenbacher, Baber, and Bronner.

37.     Baber told Schwab that she was familiar with Tramadol because she had formerly worked as a pharmacist, or in some capacity in a pharmacy, at some time prior to her employment with McKinney. She told Schwab that was a "heavy duty" drug, and to be careful with it.

38. Baber also told Schwab that she needed to keep detailed information about Schwab's medical condition, treatment, and medication(s) confidential and private, as protected by the Health Insurance Portability and Accountability Act (HIPAA).

39. As directed by Dr. Kluk, Schwab made arrangements to begin physical therapy. He scheduled the first appointment through the Department of Veterans Affairs clinic in Colorado Springs (Schwab is a veteran). He underwent physical therapy the week prior to Thanksgiving.

40. On December 6, 2020, Schwab underwent the MRI examination.

41. On December 17, 2020, Schwab saw Dr. Kluk again. Dr. Kluk told him that his shoulder's rotator cuff was completely torn all the way across, and that there was also some other damage to his bicep tendon. Dr. Kluk told Schwab that he required surgery.

42. On or about December 27, 2020, Dr. Kluk's office confirmed that Schwab would undergo surgery on Wednesday, January 13, 2021. Dr. Kluk's office told Schwab that they would provide him with a letter to give to McKinney to document his need for leave.

43. Schwab immediately told Baber that he would have surgery on January 13, 2021. He reasonably believed that Baber would relay that information to Kaltenbacher, who worked at McKinney's Pueblo office three days per week. Bronner was on vacation at that time.

44. Schwab took authorized PTO to visit family in Nashville from December 30, 2019 to January 5, 2021.

45. Baber did not advise Schwab that his need for time off qualified for FMLA leave.

46. Instead, Baber directed Schwab to use accrued paid time off ("PTO") leave for his anticipated absence due to the surgery, and also advised him to submit a claim for STD compensation.

47. Baber also, again, told Schwab that he could "go negative" on his PTO balance to ensure continuity of his income through the second week of his anticipated absence.

48. Baber also told Schwab that McKinney would require him to provide a release from his doctor in order to return to work after his absence due to surgery.

49. On January 12, 2021, Schwab submitted a request for PTO for Wednesday to Friday, January 13-15, 2021, and from Monday to Friday, January 18-22, 2021.

50. On January 13, 2021 – the day of Schwab's surgery – Bronner and Kaltenbacher rejected Schwab's PTO request because Schwab had not submitted it at least two weeks in advance. Neither Bronner nor Kaltenbacher mentioned, or appeared to know, that Schwab had just had surgery.

51. Regardless, Schwab's payroll records indicate that McKinney charged him for 64 hours of PTO, from January 13-22, 2021. This resulted in Schwab having a "negative" PTO balance of 45.92 hours.

52. On January 13, 2021, Dr. Kluk performed shoulder and bicep surgery on Schwab in Colorado Springs.

53. During the surgery, Dr. Kluk discovered that the extent of the damage that required repair was greater than originally anticipated. As a result, the amount of time that Schwab needed to recover after the surgery was longer than two weeks.

54. On January 13, 2021, Schwab's daughter called Baber to let Defendants know that he was out of surgery and in recovery, and that the surgery went well. Baber relayed this information to Kaltenbacher and Bronner.

55. On Thursday, January 14, 2021, Kaltenbacher sent an email to Schwab's work email with the subject line "Get Well", which stated: "Steve, Thank you for having your daughter call us to let us know the surgery went well. We are very happy and relieved for you. Obviously, based on other correspondence Ethan and I were surprised about the surgery. Regardless, get well. Kris." Schwab did not receive this message.

56. On Thursday, January 14, 2021, Schwab called Baber to let her know that he was okay after the surgery, and that he would follow-up shortly and send her the letter from Dr. Kluk regarding his absence. Baber thanked Schwab for letting her know, and asked him to continue to keep her up to date on his situation. Baber did not tell Schwab that Kaltenbacher and Bronner had apparently not known about the date of his surgery until after the fact.

57. Also on January 14, 2021, Baber sent an email to all of McKinney's employees to which was attached a "revised" Time Off Policy. The document included details regarding the company's paid holidays, PTO accrual rates, and all forms of time off and authorized leave, including FMLA leave. The PTO portion of the document stated that "Employees may go negative in their PTO balance up to a maximum of 40 hours with supervisor approval." In the FMLA portion of the document, there was no mention of any requirement for eligible employees to use or exhaust any PTO to run concurrently with any period of authorized FMLA leave.

58.     At no time did Baber tell Schwab that the company's policy required his supervisor's approval for him to "go negative" on his PTO balance.

59.     Regardless, Schwab never received or saw the "revised" Time Off Policy sent by Baber. Schwab never received or saw any prior version of that document either.

60.     On the morning of Sunday, January 17, 2021, Schwab emailed (from his personal email address) Baber a letter from Dr. Kluk that stated Schwab should be excused from work from <u>January 13, 2021, to February 10, 2021, "due to surgery"</u>. The period of Schwab's absence from work due to the surgery was now going to be at least <u>four</u> weeks, not two.

61.     On Monday, January 18, 2021, Baber replied to Schwab's email, acknowledging that she had received that email and its attachment.

62.     On January 19, 2021, Schwab submitted a claim for short-term disability ("STD") benefits to The Hartford insurance company.

63.     On January 19, 2021, Baber received an email notification from The Hartford regarding Schwab's application for STD benefits, which requested that McKinney complete and provide an Employer Certification Report. Baber emailed Schwab's work email address and stated she was going to complete the form, and also stated "If you wish not to utilize this, you will need to cancel the claim with The Hartford." Schwab did not receive Baber's message. Regardless, Baber promptly completed and signed the form for Schwab's claim, and emailed it back to The Hartford.

64.     At no time did Schwab ever tell Defendants in any manner that he expected to return to work following surgery on Monday, January 25, 2021. At a minimum, prior to

the surgery, he had anticipated, and told Defendants, that he would be out two weeks – at least through Wednesday, January 27, 2021.

65.     At no time did Defendants ever tell Schwab that they expected him to return to work on Monday, January 25, 2021.

66.     On January 26, 2021, Baber emailed Kaltenbacher, "Any word from Steve? I have not received anything."

67.     On January 26, 2021, Kaltenbacher attempted to call Schwab, and left him a message that Schwab needed to contact him. The phone number that Kaltenbacher called was either Schwab's work phone, or his work cell phone, not his personal cell phone. Schwab was not aware of, and never received, the message.

68.     Kaltenbacher then emailed Bronner and Baber, in which he stated that Baber had also attempted to obtain a "doctors release" from Schwab.

69.     Other than Schwab's phone call to Baber on January 14, 2021, Baber had no communication with Schwab via any means on or before January 26, 2021.

70.     At no time from January 13-29, 2021, did Defendants ever attempt to call Schwab on his personal cell phone.

71.     On January 27, 2021, Bronner authored a memorandum to Kaltenbacher and Baber in which he described alleged problems with Schwab's job performance dating back to May 2020. None of these purported issues had been previously documented. Schwab never saw the document until well after the termination of his employment.

72.     On January 27, 2021, The Hartford sent Baber a document indicating approval of Schwab's STD claim.

73. On January 29, 2021, Kaltenbacher and McKinney terminated Schwab's employment. Kaltenbacher called Schwab (again, on Schwab's work phone or work cell phone, not his personal cell phone number), and left a message that Schwab should not return to the office until they spoke. Schwab did not receive that message.

74. On January 29, 2021, Kaltenbacher also completed a "termination form" document on which he stated that he had fired Schwab for alleged poor performance.

75. On January 29, 2021, Baber called Linda Wood, the claims representative at The Hartford who was responsible for processing Schwab's STD claim. She told Ms. Wood that Schwab's employment had been terminated, effective that day, and requested they close Schwab's STD claim. She then sent an email to Ms. Wood with the same information.

76. Baber did not tell Schwab that she had requested The Hartford to close his STD claim.

77. On Saturday, January 30, 2021, Schwab's coworker, Mike Robinson, called him and told him that Schwab's employment had been terminated. Schwab texted Baber and they exchanged the following messages:

>Schwab: Mike Robinson just called me and told me I've been terminated.
>Baber: You need to call Kris.
>Schwab: Okay. Can you shed any light on this?
>Baber: Ethan and Kris both anticipated you being back to work on the 25th. Apparently they have both tried to reach out to you this week.
>Schwab: How did they reach out? My doctor's letter put me out to 2/9.
>Baber: Emails and voicemails.
>Schwab: Work emails and voicemails?

> Baber: I believe so.
>
> Schwab: Why would neither of them call on my personal cell? They've done it in the past.
>
> Baber: Honestly not sure.
>
> Schwab: Nicole what am I going to do? Okay. Thank you.
>
> Baber: Please call Kris, this may be the best way to resolve this.
>
> Schwab: Okay. Thank you.

78. Schwab then called and spoke directly with Kaltenbacher, who told Schwab that he had been fired due to "no call no show".

79. Schwab then continued his text communication with Baber, and they exchanged the following additional messages:

> Schwab: So Kris said I'm done. I have no idea what I'm going to do. Will I still be able to get the short term disability?
>
> Baber: I will reach out to our HR Director first thing Monday to gather all the details. Will be in touch.
>
> Schwab: Ok. Please use this number. Thank you.
>
> Baber: I will, I'm sorry for all of this.

80. On Tuesday, February 2, 2021, Schwab emailed Baber from his personal email address and stated "I wanted to touch base with you regarding my STD payments through The Hartford". Baber replied, "I did receive the approval for your STD on 01/27/2021. Verified with our benefits rep that the STD plan is designed to be paid out directly by The Hartford. You should be receiving that soon." Again, Baber did not tell Schwab that she had requested The Hartford to close his STD claim.

81. On February 3, 2021, Schwab contacted The Hartford directly about his STD claim. A representative of The Hartford informed him that the claim was closed because

-13-

his employment had been terminated for "no call/no show", and that he would not be receiving any STD payments. Schwab emailed Baber and relayed the information he had received from The Hartford. He asked her, "Any thoughts? I'm in serious trouble here financially." Baber replied, "Let me reach out to our rep for more details." Later, she sent Schwab another email that said she had left a message for Ms. Wood, and provided Schwab with Ms. Wood's direct contact information.

82. On February 4, 2021, Baber emailed Schwab, "I apologize for the run around concerning the Short Term Disability payment. I am awaiting confirmation from the carrier which I hope to have finalized tomorrow."

83. On February 5, 2021, Baber emailed Schwab that his Short Term Disability would be processed on "Check Date 02/12/2021", and asked Schwab whether he would prefer to receive that payment by direct deposit or check. Schwab chose direct deposit.

84. Schwab received a single STD benefit payment from The Hartford, on or about February 12, 2021. He did not receive any other STD compensation.

85. McKinney did not pay Schwab any final paycheck because of the negative PTO balance of 46 hours.

**FIRST CAUSE OF ACTION:**
**INTERFERENCE WITH PLAINTIFF'S EXERCISE**
**OF RIGHTS UNDER THE FMLA, 29 U.S.C. § 2615(a)(1)**

86. Schwab incorporates by reference all preceding paragraphs of this Complaint.

87. McKinney is engaged in "commerce" and employs a total of 50 or more employees maintained on its regular payroll, at two locations that are within 75 miles of each other.

88. McKinney is therefore a covered "employer" as defined by the FMLA. 29 U.S.C. § 2611(4)(A)(i).

89. In his capacity as McKinney's President, Kaltenbacher is a person who acted, directly or indirectly, in the interest of the company in relation to Schwab's employment. Kaltenbacher is therefore an "employer" as defined by the FMLA, 29 U.S.C. § 2611(4)(A)(ii)(I).

90. In her capacity as McKinney's Human Resources Manager, Baber is a person who acted, directed or indirectly, in the interest of the company in relation to Schwab's employment. Baber is therefore an "employer" as defined by the FMLA, 29 U.S.C. § 2611(4)(A)(ii)(I).

91. McKinney employed Schwab full-time for at least 12 months, and he had worked at least 1,250 hours for the company during the 12-month period preceding the date he qualified for FMLA leave.

92. At all relevant times, Schwab was therefore an "eligible employee" as defined by the FMLA. 29 U.S.C. § 2611(2)(A).

93. The FMLA prohibits an employer from interfering with the exercise of or the attempt to exercise any right provided by the FMLA. 29 U.S.C. § 2615(a)(1).

94. At all relevant times, Defendants were fully aware of Schwab's shoulder condition and his need for related medical care, including but not limited to the surgery and anticipated period of recovery thereafter.

95. The anticipated period of Schwab's need for leave, including the surgery and recovery, was always more than three consecutive work days.

96. In fact, Schwab told Defendants that he anticipated he would need at least two weeks of leave.

97. Schwab's need for shoulder surgery was a serious health condition that rendered him unable to perform the functions of his position for more than three consecutive full calendar days, at least as of the date of the surgery.

98. Schwab therefore qualified for, and was entitled to take, FMLA leave.

99. Defendants had acquired knowledge and enough information to determine that Schwab's leave was for an FMLA-qualifying reason. Defendants were therefore required to notify Schwab of his eligibility to take FMLA leave, and to designate Schwab's leave as FMLA-qualifying. 29 C.F.R. §§ 825.300(b)(1) and (d)(1),

100. Defendants did not timely, or ever, notify Schwab of his eligibility for FMLA leave, and did not designate his leave as FMLA-qualifying. In fact, Defendants never mentioned FMLA to Schwab at all.

101. Instead of FMLA leave, Defendants required Schwab to use accrued paid time off for a portion of his absence from work since the surgery.

102. Instead of FMLA leave, Defendants offered, and Schwab agreed, to "go negative" on his PTO balance for the second week of his anticipated absence.

103. At all times since on or about September 25, 2020, Defendants had received information from Schwab that was sufficient for them to reasonably determine that Schwab had a qualifying need for FMLA leave.

104. Even a*fter* Schwab began his absence on January 13, 2021, and Defendants knew that he had undergone surgery, Defendants *still* did not provide any FMLA notice or designation to Schwab.

105. Defendants' actions were intended to avoid their responsibilities under the FMLA.

106. Any violations of the U.S. Department of Labor regulations implementing the FMLA constitute interfering with, restraining, or denying the exercise of rights provided by the Act. 29 C.F.R. § 825.220(b).

107. By failing to notify Schwab that he had a qualifying reason for FMLA leave, and to designate Schwab's leave as FMLA-qualifying, Defendants willfully interfered with, restrained and denied Schwab's exercise of his rights as guaranteed by the FMLA, in violation of 29 U.S.C. § 2615(a)(1).

108. By terminating Schwab's employment during his absence on FMLA-qualifying leave, Defendants willfully interfered with, restrained and denied Schwab's exercise of his rights as guaranteed by the FMLA, in violation of 29 U.S.C. § 2615(a)(1).

109. As a direct and proximate result of Defendants' violations of 29 U.S.C. § 2615(a)(1), Schwab has suffered economic damages, including his lost wages and other benefits of employment.

110. Schwab is entitled to equitable relief, monetary relief for losses he has sustained as a result of Defendants' unlawful conduct, interest on that amount, liquidated damages, and attorney's fees and costs, as provided by 29 U.S.C. § 2617, in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Steven R. Schwab, respectfully requests judgment and prays for the following relief:

A.  Damages equal to the amount of wages, salary, employment benefits and other compensation denied or lost to him since the termination of his employment, together with interest thereon, pursuant to 29 U.S.C. §2617(a)(l)(A)(i)(I) and (ii).

B.  An additional amount as liquidated damages equal to the amount of damages and interest awarded as requested in paragraph (B) above, pursuant to 29 U.S.C. § 2617(a)(l)(A)(iii).

C.  Front pay in lieu of reinstatement of Plaintiff's employment.

D.  Future economic damages until Plaintiff is able to fully mitigate his damages.

E.  Plaintiff's costs of this action, reasonable attorney fees and reasonable expert witness fees, pursuant to 29 U.S.C. § 2617(a)(3); and

F.  Such other legal and equitable relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury.

Dated this 2nd day of March, 2021.

        Gary Kramer Law, LLC

        */s/Gary M. Kramer*_____
        Gary M. Kramer
        1465 Kelly Johnson Blvd, Suite 210
        Colorado Springs, CO  80920
        Tel (719) 694-2783
        Fax (719) 452-3622
        gary@garykramerlaw.com
        Attorney for Plaintiff, Steven R. Schwab